# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

SHANETTE UPCHURCH o/b/o Q.T.,   )
                                )
        Plaintiff,             )
                                )
       vs.                    )   Case No. 4:07CV749 CDP
                                )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,    )
                                )
        Defendant.         )

## MEMORANDUM AND ORDER

This case seeking child's social security benefits is before the Court for the second time. In the earlier case, the Court determined that the Commissioner's decision denying benefits was not supported by substantial evidence. On remand, the Commissioner again denied benefits. The ALJ's latest decision, like the first one, is not supported by substantial evidence. Because the record overwhelmingly supports a disability finding and another administrative hearing would unduly delay the receipt of benefits to which plaintiff is entitled, I will reverse the decision and remand plaintiff's case to the Commissioner for a calculation and award of benefits.

Plaintiff, through his mother, filed an initial application for child's Supplemental Security Income (SSI) benefits under Title XVI of the Social

Security Act, 42 U.S.C. § § 1381 et seq., on July 31, 2001. Plaintiff was issued an unfavorable determination on his application for benefits on October 26, 2001. Plaintiff requested a hearing a hearing before an Administrative Law Judge (ALJ), which was held on March 10, 2003. Plaintiff and his mother appeared with counsel and testified at the hearing. The ALJ, Francis J. Eyerman, decided plaintiff was not disabled in a decision dated March 27, 2003. Plaintiff filed a request for review with the Social Security Administration Appeals Council on May 21, 2003, which was denied by the Appeals Council on July 19, 2003. Plaintiff then sought relief in this court by filing an action for judicial review of the Commissioner's decision.

That case, styled Shanette Upchurch, et al., v. Jo Anne Barnhart, 4:03CV1120 ERW, was filed in 2003 and assigned to the Honorable E. Richard Webber, United States District Judge. Judge Webber referred the case to the Honorable Thomas C. Mummert, III, United States Magistrate Judge, for a Report and Recommended Disposition under 28 U.S.C. § 636(b). On August 31, 2004, Judge Mummert issued a Report and Recommendation which recommended that the decision of the Commissioner be reversed and the case be remanded for further proceedings pursuant to sentence 4 of 42 U.S.C. § 405(g). Judge Webber adopted the Report and Recommendation without objection by the parties and remanded

the case to the Commissioner for further proceedings on September 21, 2004.

Upon remand, the case was returned to ALJ Eyerman, who held another hearing on December 13, 2005. Plaintiff and his mother again appeared with counsel and testified at the hearing. The ALJ issued a second decision denying benefits on June 29, 2006. The Appeals Council denied plaintiff's request for review in a decision dated February 16, 2007. Therefore, the decision of the ALJ stands as the final decision of the Commissioner. Plaintiff again filed an action under 42 U.S.C. § 505 (g) for judicial review of the final decision of the Commissioner denying plaintiff supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383d. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. I conclude that the new decision is not supported by substantial evidence. I also find that plaintiff is entitled to benefits for the reasons that follow.

Evidence Before the ALJ

Facts Presented at the First Hearing

Upon remand, the ALJ considered the evidence before him at the first hearing, which Judge Mummert summarized as follows:

Ms. Upchurch, represented by counsel, was the only witness to testify

at the administrative hearing. Plaintiff was present but did not testify.

Ms. Upchurch testified that Plaintiff was then eight years old and in the second grade. He was in special education classes half the school day and had been retained in kindergarten. He was in a self-contained class for the special education classes because he had difficulty switching classes and with accepting his teachers' authority. She would receive telephone calls at work, approximately twice a week, that he was having outbursts at school and would have to leave to go talk to him. His last outburst was the Friday before the hearing. Ms. Upchurch opined that she had been to school more than 50 times since Plaintiff started second grade. He has been in in-school suspension and has been suspended twice from school. She spoke with his teachers frequently about his behavior.

Plaintiff had been hospitalized once, approximately two years before for one week. He was treated in the hospital by Dr. Shanker and still saw him once every three months. He was on medication, Concerta, and would start therapy as soon as she could find a therapist. He did attend a counseling "class" at school to help him learn how to behave.

Ms. Upchurch works with Plaintiff at home on his schoolwork. He has difficulty focusing on the work. And, she has to remind him to do his chores. He does not, however, have any physical problems sitting or any problems with bathing, dressing, and feeding himself. He plays with the neighborhood children and with his cousins. He does not have the outbursts at home.

The documentary record before the ALJ included records completed on Plaintiff's behalf, school records, and records from his health care providers. A function report completed by Ms. Upchurch listed three areas of difficulties. Specifically, Plaintiff's impairments (1) limited his ability to (a) read and understand simple sentences, (b) write in script, (c) write a simple story, (d) understand money and make correct change, and (e) tell time; (2) adversely affected his ability to get along with his teachers; and (3) adversely affected his ability to accept criticism or correction. She reported in a daily activities report

that Plaintiff was "a little calmer" since taking medication but still had problems with anger and becoming violent. When he became angry at school, he would act out and would sometimes have to be sent home. He did have friends his own age.

When requesting a hearing, Ms. Upchurch reported that Plaintiff continued to act out uncontrollably at school and could not function without his medication. After Plaintiff's medications were changed, she reported that he was more emotional and could not sleep.

Ms. Elizabeth Palliser Stone, Plaintiff's first grade teacher, completed a questionnaire in October 2001. She had known Plaintiff for six weeks. Plaintiff was in special education classes for 3½ hours each day. She noted that he had difficulty applying knowledge and that he did better with one-on-one assistance. He could work well with adults when things went his way, but became argumentative when they did not.

Plaintiff's school records began with the 1999/2000 school year when he was in kindergarten. At the end of that year, it was recommended that he repeat kindergarten. In the spring of the following school year, an individualized education program ("IEP") was developed for Plaintiff. One of IEP goals was to "develop mechanism to recognize and cope with negative reactions." It was also noted that "[s]ince beginning new medication after being diagnosed with post traumatic stress syndrome, [Plaintiff] has had fewer major episodes involving defiance building into crying and self-destructive behavior." "No concerns were indicated in the areas of vision, hearing, health, [motor], adaptive behavior, cognition, oral language, speech, reading, math, or written expression." Also as part of the IEP evaluation, Plaintiff was identified as a student with "Emotional Disturbance." That evaluation included the following remarks:

> [Plaintiff's] school behavior and social-emotional functioning was evaluated using the Achenbach Behavior Rating Scale, classroom observations, teacher interviews, review of his discipline file, sentence

completion test and student interviews. The results of all of these methods of assessment indicated significant behavioral and functional concerns, which have frequently and intensely interfered with his school functioning for at least a year. The following behaviors occur with such frequency and/or are so aberrant as to impact significantly [Plaintiff's] school performance. The nature of his emotional disturbance involves a general and pervasive mood of unhappiness, a high level of anxiety, depression, as well as significant difficulties with anger control and interpersonal relationships. [Plaintiff ]often misperceives and reacts inappropriately to school and social situations. During these times, he exhibits explosive and unpredictable behavior and significant mood swings. When upset, he frequently exhibits self-destructive behaviors[,] including head banging, hitting himself, and bending his fingers backward. [Plaintiff] often appears anxious, tense and fearful, picks at his fingers, ears and hair, does not exhibit a sense of humor, sulks and refuses to talk, cries a lot, and is under active. He says others are out to get him and has talked about committing suicide. [Plaintiff] frequently responds to correction by authority figures with defiance, threats to others, and by tantruming. Immediately following these incidents, [Plaintiff] often states he is wrongly blamed for the problems and rarely accepts responsibility for his involvement. He has difficulty concentrating, makes noises in class, can not sit still, disturbs other pupils, and behaves impulsively. In his frustration and anxiety, [Plaintiff] frequently responds to perceived threats by becoming verbally and/or physically threatening and aggressive to himself and others. [Plaintiff] exhibits a low self-esteem and lack of self-confidence and the acting out is a defense mechanism. He expresses a desire for improvement in his social and emotional functioning but does not have the skills to make consistent changes independently.

Plaintiff started first grade the following September. At the end of the first quarter, he was marked "Satisfactory" in the five subject areas, i.e., written communication, spelling, mathematics, social studies, and science. The teacher "predict[ed] he [would] do well in 1st grade if he stay[ed] focused." Another teacher rated his progress in reading as "Satisfactory." In the category of "Work Habits/Social Development," Plaintiff was marked as "Satisfactory" in only 7 of the 19 areas. He was marked as "Needs Improvement" in the other 12 areas, including "Demonstrates self control," "Resolves conflicts with appropriate strategies," "Works cooperatively in groups," and "Accepts responsibility for behavior." This was an improvement, however, over the previous year when he was rated "Satisfactory" in only three areas of "Work Habits/Social Development."

In the second semester of first grade, Plaintiff was again evaluated for an IEP. It was noted that he was then in a self-contained classroom for the emotionally disturbed, with the exception of a two-hour period when he was in regular education classes. It was noted that his behavior, specifically his physical aggressiveness and threatening of others, had "calmed" down. He was meeting weekly with a social worker in an anger management class. The recommendation was that he be continued in a self-contained classroom for at least 60% of the school day.

Plaintiff's school records also included reports of various disciplinary actions. In November 2000, the year he repeated kindergarten, he was placed in in-school suspension for being defiant and for repeated school violations. Two days later, he was sent to the office for being disruptive. The following January, he was suspended from riding the bus for one day for being "unsafe on the bus on many occasions." The next week, he was removed from the classroom for disruptive behavior and for kicking the teacher. Five days later, he was again placed in in-school suspension after he ripped material from the classroom wall.

In February, Plaintiff served a one-day in-school suspension after he threw chairs, hit a student on the bus, and refused to walk to the

office.  Four days later, he was again placed in in-school suspension for being disruptive and insubordinate.  The next day, Plaintiff was sent to the office because he was kicking other children.  Sometime later that same day, he was again sent to the office because he was being disruptive in the classroom.  A call to the Behavioral Health Response hotline was made.  The intake notes of the intake social worker at Behavioral Health Response, Inc., described the presenting problem as:

> [Plaintiff] is displaying disruptive behavior in the classroom:  throwing chairs, kicking other children, etc. [Plaintiff] has also been purposely harmful to self: banging head, hitting himself, pulling his own hair, [and] bending fingers back while stating that he wants to break his fingers.  [Plaintiff] . . . admits that he does these things when he is bored or angry.  [Plaintiff] is remorseful [and] goes into crying spells frequently. [Plaintiff] reports frequent nightmares too.

His last day at school without a report to the office had been ten days before.

The next day, Plaintiff was sent to the office after he threw things in the classroom.  When in the office, he refused to remain, kicking and hitting the office door.  The day after, on February 15, he was suspended from school for the remainder of the day and for the next day because he did not remain in in-school suspension when placed there and was disruptive.  In May, he was suspended for the remainder of the day and for the following day for "insubordination, aggressive behavior[,] and class disruption."  He had been sent to the office three times that day.  The following November, Ms. Upchurch received a warning letter about Plaintiff's misbehavior on the school bus.  He had been "very disruptive" and would be assigned a front seat.

The records before the ALJ also included Plaintiff's medical records for the period between March 2001 and December 2002.

On March 22, 2001, Plaintiff was admitted to the DePaul Health Center. The admission notes refer to a previous treatment with Buspar. That medication was discontinued after he became lethargic. It was noted that he had witnessed his mother being hit by his father. One physician, Michael Shanker, M.D., noted that Plaintiff was not suicidal or homicidal. Another physician, Jay Englehart, M.D., noted that Plaintiff had expressed suicidal ideation at school, although Plaintiff denied having any such ideation at the present. He also noted that Plaintiff's self-abusive behavior had been reportedly increasing. Plaintiff had been hearing voices telling him to do things, including kicking his teachers. It was also noted that his symptomatology was not occurring at home, militating against a diagnosis of ADHD. He was discharged four days later and was to return to the partial hospital program. Dr. Shanker assessed Plaintiff's Global Assessment of Functioning ("GAF") score at discharge as 50. Dr. Englehart assessed his GAF as currently being 35 and as being 60 at its highest.

Plaintiff did participate in the partial hospital program. Three months later, he began treatment with Dr. Shanker. Dr. Shanker's notes are generally illegible. It is clear, however, that he prescribed Concerta at the first visit. He noted six months later that Plaintiff had pulled his pants down in front of the class. Plaintiff was falling asleep at 10 o'clock at night and waking up at 3:30 in the morning. His dosage of Concerta was doubled. Four months later, in April 2002, Plaintiff was no longer telling lies, engaging in destructive behavior, or having temper tantrums. The following month, Dr. Shanker discussed the use of "TCA" with Dr. Rhee, a physician at St. Louis Children's Hospital. The use was okayed, but a follow-up EKG would be performed at the hospital. In December, Plaintiff's dosage of Concerta was reduced in half. Plaintiff's episodes of screaming and kicking were rare.

In March 2003, Dr. Shanker assessed Plaintiff's level as functioning in six areas. Plaintiff's limitations in his ability to function in the areas of acquiring/using information, caring for self, interacting/relate to others, and attending to/completing tasks were assessed as being

"marked." His limitations in the area of health and physical well-being were "moderate"; and, he had no limitations in his ability to move and manipulate objects.

R. Rocco Cottone, Ph.D., assessed Plaintiff's functioning differently. He concluded that Plaintiff did not have a marked limitation in at least two areas of functioning and did not have an impairment or combination of impairments that equaled or were the functional equivalent of a listed impairment.

(internal citations omitted).

<u>Additional Facts Presented at the Second Hearing</u>

At the second hearing, evidence was presented to the ALJ that plaintiff received normal childhood immunizations and continuing treatment for ADHD from his pediatrician, Mary A Tillman, M.D. in 2005. Dr. Tillman had been plaintiff's pediatrician since birth and began refilling his prescriptions for Concerta in February 2005, noting that he took no medication. Adderall was added to the regimen in October 2005.

In a report dated September 3, 2004, plaintiff received a "good" rating in Math, Science, Communication Arts, and Social Studies. During the school year, his grades ranged from A to C in most subjects. Anne Schwarte, plaintiff's special education teacher, stated that plaintiff "had shown a great deal of improvement in behavior and academics third quarter."

Plaintiff was suspended from school for three days in March of 2005 for

disruptive conduct and speech. Plaintiff attempted to fight another student in class, and then refused to leave the classroom and became disruptive when ordered to the principal's office.

An IEP from April 2005 reflects that plaintiff continued to have an educational diagnosis of emotionally disturbed. Plaintiff was noted to have difficulty relating appropriately with peers, refusing to follow instruction, noncompliance with adults, walking out of class, and difficulty controlling anger. It was noted that plaintiff showed a gradual increase in behaviors associated with his medical diagnosis of ADHD and that he improved once he began taking his medicine. Plaintiff's accommodations included modified weight of course examinations, course components, use of weekly grade checks, and note taking assistance and study guides for lectures. Tests and exams were to be oral, short answer, of reduced length, with open book, with reading of the test to the student, in a modified test format with recording of student responses in an alternative setting. Plaintiff's assignments were to be read or tape-recorded, with lower difficulty. Finally, plaintiff was placed in a self-contained classroom for all academic subjects. Plaintiff's mother requested that the school nurse administer plaintiff's medications because he sometimes forgot to take them on his own and his behavior improved on medication.

A teacher questionnaire was completed by Anne Schwarte, a special education teacher who was plaintiff's self-contained classroom teacher, on September 5, 2005. Ms. Schwarte noted that plaintiff had serious problems with understanding school and content vocabulary, reading and comprehending written material, providing organized oral explanations and adequate descriptions, comprehending and/or following oral instructions, expressing ideas in written form, learning new material, providing oral explanations and adequate descriptions, comprehending and/or following oral instructions, expressing ideas in written form, learning new material, and applying problem solving skills in class discussions. She noted that plaintiff had obvious problems with comprehending and/or following oral instructions, comprehending and doing math problems, and recalling applying previously learned material. Plaintiff was assessed in attending and completing tasks, as having very serious problems with paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, refocusing on the task when necessary, changing from one activity to another without being disrupted, organizing own things or school materials, completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace and finishing on time. Schwarte also noted that plaintiff had a serious problem in sustaining attention

during play/sports activities, carrying out multi-step instructions, waiting to take turns, and completing class and homework assignments.  In interacting and relating to others, Schwarte said that plaintiff had a very serious problem in nearly all areas, even though he spent most of the school day in a highly structured, self-contained classroom.  Plaintiff's teacher noted that plaintiff had a very serious problem in caring for himself in the areas of handling frustration properly, being patient when necessary, responding appropriately to changes in his own mood, and knowing when to ask for help.  Plaintiff was also rated as having an obvious or serious problem in the areas of using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, and using appropriate coping skills to meet daily demands of the school environment.  Finally, Schwarte noted that plaintiff needed frequent prompts to stay on task and in his seat even in the self-contained classroom.

In an informal progress report dated September 16, 2005, plaintiff's physical education teacher told plaintiff he did a "good job" and had positive strengths in all areas.

On October 10, 2005, plaintiff had a student conference after a temper tantrum in his classroom.  Plaintiff was removed from the classroom the next day for disruptive behavior.

On October 27, 2005, Schwarte wrote a letter "To Whom it May Concern" that plaintiff's behavior had changed "drastically" over the last few months. She noted that plaintiff fought frequently with adults and peers and had difficulty relating in a positive way. She also noted that his behaviors seemed to be increasing in intensity and frequency.

On November 30, 2005, plaintiff was suspended from school for five days for disruptive conduct and speech.

On January 6, 2006, plaintiff's treating physician, Dr. Tillman, completed a Child's Functioning Questionnaire. Dr. Tillman assessed plaintiff as having marked impairment in the following areas: learning new material, recalling previously learned material, demonstrating short-term recall, understanding verbal instructions, following verbal instructions, demonstrating problem-solving skills, using appropriate vocabulary, comprehending written instructions, and using imagination in play and creative activities. Plaintiff was noted to have extreme difficulty with remembering instructions, following instructions, and recognizing and using concepts. Dr. Tillman indicated that plaintiff's behavior problems included not listening in class, disturbing classmates, not following instructions, correctly completing schoolwork, and profound inattentiveness. In terms of interacting and relating to others, plaintiff had extreme difficulty with getting

along with other children, getting along with authority figures, being disruptive, talking out of turn, respecting authority, being obedient, having unprovoked hostility and anger, and having aggression. Dr. Tillman also noted that plaintiff had marked limitations in sharing and taking turns, initiating interactions, interacting appropriately with adults, and talking constantly. In attending and completing tasks, plaintiff had extreme difficulty in being able to initiate and complete most activities, beginning, carrying through and finishing most enjoyable activities, persevering and keeping pace with peers, being able to filter out distractions, being able to maintain focus during group activities, being able to return to task after interruptions, being able to take turns, being able to change activities, being able to tolerate frustration, controlling the impulse to blurt out answers, being easily distracted, following through on instructions, concentrating on adult supervision, carrying out simple instructions, completing tasks on time, paying attention, doing tasks without bothering others, and staying on task without being reminded. Dr. Tillman also stated that plaintiff had extreme difficulty organizing self and belongings for class, maintaining his own space, and following through on reaching goals. Finally, Dr. Tillman noted that plaintiff had periods of unprovoked fear or anxiety, and was unable to enjoy or fully participate in group activities and demonstrate emotions.

Allan Barclay, Ph.D., a licensed clinical psychologist, testified as a consultative medical expert at the second hearing. He did not examine plaintiff. After reviewing some of the records, Dr. Barclay testified that plaintiff did not have attention deficit/hyperactivity disorder because there were no documented findings of marked inattention or marked impulsiveness. Instead, he opined that plaintiff experienced only moderate hyperactivity that did not meed or equal listing 112.11. Dr. Barclay believed that plaintiff's depression had resolved and that he had good ratings in terms of academic tasks. In the domains of acquiring and using information, attending and completing tasks, interacting and relating to others, and health and physical well-being, Dr. Barclay testified that plaintiff had a less than marked impairment. He testified that plaintiff had no impairment in moving about and manipulating objects and caring for himself. Dr. Barclay then opined that a diagnosis of conduct disorder was appropriate, based on his review of records and on his observations of plaintiff during the hearing. He testified that plaintiff had been relatively quiet, was not particularly fidgety, had answered the ALJ's questions, and had not shown any impulsiveness during the hearing, which lasted about one hour and forty-five minutes. Dr. Barclay had not reviewed Dr. Tillman's questionnaire before testifying because the evidence from Dr. Tillman was submitted after the hearing with the permission of the ALJ.

Plaintiff and his mother also testified at the second hearing. Plaintiff testified that he was eleven years old, and when asked initially by the ALJ whether he understood what it means to tell the truth, he responded, "No." He later changed his answer to "Yes" when asked a second time. Plaintiff knew his address and testified that he was in the fifth grade. He said that he cut his hand using a can opener at home. He stated that he took Concerta for his behavior because he has "acting problems." When asked to explain what he meant by that, plaintiff responded that he gets "angry really fast when somebody tells me something." He stated that he does not know why this happens, and that he does not get angry at home. He did not know his height, weight, or pants size, but he did know his shoe size. Plaintiff testified that he showers and feeds himself, and helps his mother around the house. He said that he has friends in the neighborhood that go to his school, and they play sports and in the park together.

Plaintiff's mother also testified at the hearing. She stated that Dr. Tillman had been plaintiff's pediatrician since birth. Dr. Tillman began prescribing plaintiff's medications when Dr. Shanker retired. About one month before the hearing, Dr. Tillman changed plaintiff's medication and began prescribing Adderall instead of Concerta. She said Adderall makes plaintiff withdrawn and sleepy. The school nurse gives plaintiff his medication after breakfast. Plaintiff's

mother also testified that Dr. Tillman recommended that plaintiff began seeing another psychiatrist since Dr. Shanker retired. Dr. Tillman referred plaintiff to the Grace Hill psychiatric clinic, but his first appointment was scheduled after the hearing.

Plaintiff's mother testified that plaintiff remained in a self-contained classroom, where he has been since kindergarten. Anne Schwarte has been plaintiff's teacher for the last two years and communicates with her about plaintiff's behavior two or three times a week. Schwarte told plaintiff's mother that plaintiff often gets angry, has outbursts, and runs out of the classroom. Plaintiff's mother last spoke with Schwarte the week before the hearing about plaintiff's five-day suspension for bringing a cell phone to school. Schwarte told her that plaintiff's behavior has gotten worse over the last year. In response to questioning by the ALJ, plaintiff's mother testified that plaintiff's grades were good, and that he helped with chores around the house, including caring for his baby brother.

### Judge Webber's Order of Remand

In his Memorandum and Order remanding the case to the Commissioner, Judge Webber held that the ALJ did not fulfill his duty to fairly develop the record. Judge Webber found that the ALJ's decision to discount Dr. Shanker's

assessment of plaintiff was not supported by the evidence, including the assessment of the consultative examiner, Dr. Cottone. Judge Webber noted that the ALJ's reliance on the results of a one-time consultative examination does not constitute substantial evidence on which the ALJ may permissibly base his decision, particularly where the assessment was made without an examination of plaintiff and is the only evidence to contradict the treating physician. However, Judge Webber remanded the case to the Commissioner for further consideration because the record was not developed about the degree of plaintiff's improvement on medication. In his Memorandum and Order, Judge Webber held that "[t]he case should be remanded for . . . development, including, if necessary, a consultative examination to determine the extent of any continuing behavior problems of plaintiff when on medication and the inclusion of current school records."

## The ALJ's Decision

The ALJ recognized that Judge Webber had remanded the case for further consideration and concluded, based on the prior and supplemental evidence, that plaintiff was not disabled. The ALJ then stated that the evidence and "the analysis of the evidence in [the prior] decision is also incorporated [into the present decision], except to the extent that the analysis may be invalid, incomplete, or

otherwise inconsistent with the analysis in this decision."

After summarizing the testimony and records offered at the supplemental hearing, the ALJ then stated that he "is not basing his decision on the medical expert's testimony." Instead, the ALJ opined as follows:

> What this case boils down to is answering the same common-sense questions that govern most childhood disability cases under the Social Security Act where objectionable behavior is at issue. Are the claimant's objectionable behaviors really that bad or that frequent? If so, are they the result of uncontrollable disease pathology or the result of willful volition? If they are the result of pathology, can they be controlled by medication? If they can be controlled by medication and are not, does the claimant have a good excuse for not taking the medication?

The ALJ then stated that, as he "pointed out in his prior decision, the claimant's behaviors were not all that frequent and they eventually became controlled much better after he started taking the Concerta and after the dosage was increased once or twice." The ALJ then found that plaintiff's behavior improved until close to his hearing, so that "[a] cynic could be forgiven for noticing that the claimant's school behaviors worthy of disciplinary citation increased in head-of-steam frequency and intensity in the weeks leading up to his next disability hearing."

The ALJ decided to give little weight to the January 6, 2006 assessment by Dr. Tillman because he believed it to be "inconsistent with the preponderance of the credible school evidence and other medical evidence." In discounting her

opinions, the ALJ noted that Dr. Tillman is "not a mental health specialist, and there is no evidence that she did anything more than guess or parrot what the claimant and his mother wanted her to say." The ALJ went on to criticize the questionnaire as follows:

> It also does not help the credibility of this report that it is the product of a pre-printed form questionnaire, submitted to Dr. Tillman by the claimant's attorney. The form is not designed for objectivity, but rather for verification of some preconceived suggested conclusions about the claimant's allegedly diminished health and fitness. It is intended to further the claimant's litigation interests more than his medical ones. The fact that it allows for negative check-off responses -i.e., ones that don't help the claimant's case- as well as positive ones does not change the fundamentally suggestive construction of the form.

The ALJ then concluded that "contrary to the medical expert, . . . there is enough evidence to find that the claimant has ADHD and post-traumatic stress disorder." However, the ALJ concluded that these medically established mental impairments "do not produce frequent, severe behaviors. If they do, they are controllable by medication the claimant can take without functionally disruptive adverse side effects." The ALJ found that plaintiff at times failed to take his medication without good reason, noting that "[a] claimant who fails without good cause to follow prescribed medical treatment that may restore his normal functioning ability may be found not disabled." For these reasons, the ALJ concluded that

plaintiff has "less than marked limitations in attending to and completing tasks, interacting and relating with others, and health and physical well-being, with no credible limitations in any of the other domains." In conclusion, the ALJ found the allegations of plaintiff's marked or extreme functional limitations not credible and decided plaintiff was not disabled.

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(I) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. Rucker v. Apfel, 141 F.3d 1256, 1259 (8th Cir. 1998); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998); Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence,

however, the court must also take into account whatever in the record fairly detracts from that decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999); Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); Bryant v. Apfel, 141 F.3d 1249, 1250 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. Tate v. Apfel, 167 F.3d 1191, 1196 (8th Cir. 1999); Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998). See also Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (interim quotations omitted)).

Under the Act, the ALJ inquires first into whether the child is currently engaged in substantial gainful activity and next into whether the child has an impairment or a combination of impairments that is severe. Walker v. Apfel, 141 F.3d 852, 854 (8th Cir. 1998); Bryant, 141 F.3d at 1251. If the ALJ finds at step two of the evaluation that a child's impairments are severe, as in the instant case, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year. Walker, 141 F.3d at 854; 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or

medically equals the severity of a set of criteria for an impairment in the listings, or

if it functionally equals the listings." Id. See also 20 C.F.R. § 416.924(a); 20

C.F.R. Part 404, Subpart P, Appendix 1, Part B. See also Walker, 141 F.3d at 854

(finding last step of evaluation process to be whether the impairment or

combination if impairments is of comparable severity to impairments that would

disable an adult). To determine functional equivalence, the Commissioner

considers the child's functioning in six (6) areas or domains. 20 C.F.R. §

416.926a(b)(1). Those domains are: 1) acquiring and using information; 2)

attending and completing tasks; 3) interacting and relating with others; 4) moving

about and manipulating objects; 5) caring for yourself; and 6) health and physical

well-being. 20 C.F.R. § 416.926a(a).

   "[I]n general, a child's impairment(s) is of 'listing level severity' if it causes

marked limitations in two broad areas of functioning or extreme limitations in one

such area." 20 C.F.R. § 416.925(b)(2). A limitation is "marked" for children from

age 3 to age 18 if it is "'more than moderate' and 'less than extreme.'" 20 C.F.R.

§ 416.926a(e)(2). A "marked" limitation is also found when the impairment(s)

"interferes seriously with [the child's] ability to independently initiate, sustain, or

complete activities." Id. See also Garrett ex rel. Moore v. Barnhart, 366 F.3d 643,

651 (8th Cir. 2004) (quoting § 416.926a). There may be a "marked" limitation in

only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairment(s).  20 C.F.R. § 416.926a(e)(2).

A limitation is "extreme" for the same age group if the impairment(s) "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).  "'Extreme' limitation also means a limitation that is 'more than marked.'"  Id.

When assessing the degree of a child's functional limitations, the ALJ may consider, inter alia, "the effects of structured or supportive settings," how the child functions in school, and the effects of the child's medications, if any.  20 C.F.R. § 416.926a(a)(1)-(3).

In the domain of "acquiring and using information," the ALJ considers, inter alia, how well a child acquires, learn, and uses information.  20 C.F.R. § 416.926a(g).  A school age child should be able to learn to read, write, do math, and discuss history and science, to demonstrate what he has learned in an academic setting through test taking, group work, and class discussions, to use these skills in daily living situations, to share information and ideas with individuals and in groups by asking questions and expressing his own ideas, and by understanding and responding to the opinions of others.  20 C.F.R. § 416.926a(g)(2)(iv).  In the domain of "attending and completing tasks," a child's ability to focus and maintain

attention and to begin, carry through, and finish his activities, including the pace at which he does so and the ease with which he changes activities is considered. 20 C.F.R. § 416.926a(h). A school age child should be able to focus his attention in a variety of situations, to concentrate on details, to change activities or routines without distracting himself or others, to stay on task, and to complete a transition task without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv). In the domain of "interacting and relating with others," the ALJ considers, inter alia, how well a child initiates and sustains emotional connections with others, cooperates with others, and responds to criticism. 20 C.F.R. § 416.926a(I). School age children should begin to understand how to work in groups. 20 C.F.R. § 416.926a(i)(2)(iv). In the domain of "caring for oneself," the ALJ considers, inter alia, how well a child copes with stress and changes in his environment. 20 C.F.R. § 416.926a(k). A school-age child should begin to demonstrate consistent control over his behavior and to avoid unsafe behaviors. 20 C.F.R. § 416.926a(k)(2)(iv).

Finally, in determining a child's disability, the Commissioner must consider all relevant evidence which may include medical evidence, school records, and information from people who know the child -- such as parents, caregivers, and teachers -- and can provide evidence about his functioning. 20 C.F.R. §

416.924a(a).

## Discussion

"Because the social security disability hearing is non-adversarial, . . . the ALJ's duty to develop the record exists independent of the claimant's burden in the case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). This duty includes the ordering of a consultative examination when such an evaluation is necessary for an informed decision. Haley v. Massanari, 258 F.3d 742, 749 (8th Cir. 2001). Although the ALJ "must neutrally develop the facts," the ALJ need not "seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Stormo, 377 F.3d at 806. The ALJ also need not order a consultative examination if the record contains substantial evidence to support the ALJ's decision. Haley, 258 F.3d at 749. If an ALJ fails to fairly develop the record, the court may remand for the taking of additional evidence. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002). "'There is no bright line test for determining when the [Commissioner] has . . . failed to develop the record. The determination in each case must be made on a case by case basis.'" Gregg v. Barnhart, 354 F.3d 710, 712 (8th Cir. 2003) (quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994)).

Despite Judge Webber's directive that he do so, the ALJ did not fulfill his

duty to fairly develop the record upon remand. The ALJ did not properly consider

the opinions of plaintiff's treating physicians. Judge Webber specifically found

that the ALJ improperly rejected Dr. Shanker's opinions and relied upon Dr.

Cottone's consultative assessment, which was performed without an examination

of plaintiff. Yet on remand, the ALJ did not direct that the consultative examiner,

Dr. Barclay, examine plaintiff. Instead Dr. Barclay opined that plaintiff was not

disabled based upon his review of some of the records and his observation of

plaintiff during the hearing, which lasted about one hour and forty-five minutes.

The opinion of the non-examining consultative physicians are the only opinions to

contradict both of plaintiff's treating physicians, his special education teacher, and

the school records. "The opinions of doctors who have not examined the claimant

ordinarily do not constitute substantial evidence on the record as a whole."

Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

In addition to Dr. Shanker, whose opinions were thoroughly reviewed by

Judge Webber[1], plaintiff's treating physician Dr. Tillman also concluded that

plaintiff had marked impairments in acquiring and using information, caring for

---

[1]In March 2003, Dr. Shanker assessed Plaintiff's level as functioning in six areas. Plaintiff's limitations in his ability to function in the areas of acquiring/using information, caring for self, interacting/relate to others, and attending to/completing tasks were assessed as being "marked." His limitations in the area of health and physical well-being were "moderate"; and, he had no limitations in his ability to move and manipulate objects.

himself, interacting and relating to others, and attending to and completing tasks. Dr. Tillman had been plaintiff's treating pediatrician since birth and began prescribing his medication when Dr. Shanker retired. Ordinarily, a treating physician's opinion should not be discarded and is entitled to substantial weight. See Ghant v. Bowen, 930 F.2d 630, 639 (8th Cir. 1991). A treating physician's opinion regarding a plaintiff's impairment should be granted controlling weight when well-supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See Singh v. Apfel, 222 F.3d 448 (8th Cir. 2000).

Dr. Tillman's assessment is consistent with the other medical evidence in the record, including Dr. Shanker's report and plaintiff's hospitalization records from March 2001, as well as plaintiff's school records. Yet the ALJ gave little weight to Dr. Tillman's opinions because she is not a mental health specialist and her opinions were rendered on a pre-printed questionnaire given to her by plaintiff's attorney. The ALJ found the form highly suggestive, although he does not explain the basis for this conclusion and acknowledges that the form does allow for negative responses that do not support plaintiff's request for benefits.[2] If the basis

---

[2]The ALJ's conclusion about the suggestive nature of the form plaintiff submitted to Dr. Tillman is especially troubling given that it is basically the same as the Section of Disability Determinations form sent to plaintiff's counselor by the State of Missouri Department of

for Dr. Tillman's opinions was unclear, the ALJ could have requested additional

information and clarification.  See 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

Social Security Rule 96-2p directs the ALJ to grant deference, albeit not

controlling weight, to a treating physician's opinion even if not well supported:+

> A finding that a treating source medical opinion is not well supported
> by medically acceptable clinical and laboratory diagnostic techniques
> or is inconsistent with the other substantial evidence in the case
> records means only that the opinion is not entitled to controlling
> weight, not that the opinion should be rejected.  Treating source
> medical opinions are still entitled to deference and must be weighed
> using all the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.
> In many cases, a treating source's medical opinion will be entitled to
> the greatest weight and should be adopted, even if it does not meet the
> test for controlling weight.

Social Security Ruling 96-2p.  Under these circumstances, the ALJ failed to fulfill

his duty to fully and fairly develop the record after remand.   There is no evidence

to support the ALJ's conclusion that Dr. Tillman was "parroting" what plaintiff

wanted her to say, as opposed to rendering her independent medical opinion,

merely because she completed a form provided by counsel.  See Singh v. Apfel,

222 F.3d 448, 452 (8th Cir. 2000) (the ALJ must provide a good reason to reject

the opinion of a treating physician).  The ALJ's decision to accord only "little

---

Elementary and Secondary Education.  That form, which the ALJ did not criticize, states that it is
used to evaluate plaintiff's disability claim "in cooperation with the Social Security
Administration."  (Tr. at 326).

weight" to Dr. Tillman's opinions is not supported by substantial evidence. <u>See</u> <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000) (opinions of one-time consultative examiner who did not examine claimant do not ordinarily constitute substantial evidence on the record as a whole upon which a decision may be based); <u>Jenkins v. Apfel</u>, 196 F.3d 922, 925 (8th Cir. 1999) (same). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion. <u>Singh</u>, 222 F.3d at 452; <u>Prosch</u>, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Here, the ALJ did not.

Plaintiff's school records are also consistent with the opinions of plaintiff's treating physicians and do not support the ALJ's findings. The ALJ opines that the "credible school evidence" is inconsistent with Dr. Tillman's opinions, but he fails to articulate what school evidence he accepts as credible, what evidence he rejects as lacking in credibility, and the basis for his credibility determinations. The ALJ recites the informal progress report dated September 16, 2005 completed by plaintiff's physical education teacher (referred to in the opinion as a "school official") as evidence that plaintiff's behavior had improved. In that report, the physical education teacher told plaintiff he did a "good job" and had positive strengths in all areas.

The ALJ also pointed to a statement in Anne Schwarte's October 27, 2005, letter as evidence that plaintiff's "misbehaviors are volitional and not uncontrollable," yet the ALJ took that statement out of context. Ms. Schwarte actually stated that plaintiff "can be very polite with adults, but he can also be very argumentative. He challenges classroom and school rules and pretends he doesn't know then if caught breaking them. He will argue with staff at great length, and will not let up or quit talking til he feels he has won. If he doesn't feel he has won, he will begin again the above behaviors." This paragraph is preceded by four paragraphs describing plaintiff's behaviors, including uncontrollable angry outbursts, non-responsiveness, regression in age-appropriate behaviors, screaming, kicking, groaning, and banging his head against the walls and furniture, running through the school and refusing to stop, being suspicious and argumentative with peers, and being socially withdrawn. Ms. Schwarte concluded that plaintiff's behavioral changes in the 2005 school year were becoming "more intense and frequent." When Ms. Schwarte's comment about plaintiff's occasional politeness to adults is read in context, it does not support the ALJ's conclusion that plaintiff's behaviors are volitional.

As found by Judge Webber, plaintiff's report card from the 1999-2000 school year reflected concerns in demonstrating self-control, following class and

school rules, working carefully and neatly, demonstrating consistent effort, and respecting authority. An IEP dated April 27, 2001, indicated that plaintiff needed resource room services to address social skills and task completion with goals including following classroom rules and transition procedures, and completing assigned tasks within defined time limits. The IEP stated that plaintiff needed to develop mechanisms to recognize and cope with negative reactions and to follow adult directives. Finally, it was noted that plaintiff had high levels of anxiety which interfered with his ability to function, which negatively affected his progress in a general education setting. A teacher questionnaire, completed by Elizabeth Stone on October 4, 2001, stated that plaintiff had significant difficulty with comprehension and interpersonal skills. An October 8, 2001, letter from the Riverview Gardens School District reflects that plaintiff had been placed in a highly structured, self-contained setting for one half of each day with areas of concern including behavior, reading, math, written language, and social skills. His school records from 2001 also reflect multiple disciplinary referrals.

By April of 2002, plaintiff had been moved to a self-contained classroom with a diagnosis of emotional disturbance. His IEP from that time period reflected plaintiff's areas of concern to include emotional disturbance, anxiety, noncompliance with rules and directions, and poor task focus on school work.

Plaintiff was given significant accommodations including extended time for completion of tests and assignments, lower difficulty levels, oral cures and prompts, and adaptation of worksheets and packets.  Plaintiff's report card from the first quarter of the 2001-2002 school year showed plaintiff as having difficulty with demonstrating self control, following classroom and school rules, resolving conflicts properly, seeking help appropriately, remaining organized, working cooperatively in groups, following oral and written directions, completing homework on time, showing respect for peers and property, accepting responsibility for behavior, demonstrating self-control, listening while others speak, demonstrating consistent effort, and respecting authority.   Although his records from this period do indicate that plaintiff was improving, the supplemental evidence received at the second hearing indicates that he continued to have significant behavioral difficulties at school.

Plaintiff was suspended for three days in March 2005 for disruptive conduct and speech.   An April 2005 IEP noted that plaintiff continued to have difficulty staying on task, relating appropriately, non-compliance with adults, refusing to follow directions, walking out of the class, and difficulty with controlling anger. Accommodations included modified testing, and plaintiff remained in a self-contained classroom.   The IEP also noted a request by plaintiff's mother for the

school nurse to administer plaintiff's medication because plaintiff sometimes forgot to take it on his own. At the hearing, plaintiff and his mother testified that the school nurse gave plaintiff his medication.

In the teacher questionnaire completed by Ms. Schwarte on September 5, 2005, Ms. Schwarte noted that plaintiff had: serious problems with understanding school and content vocabulary; obvious problems comprehending and following oral instructions; and very serious problems paying attention, focusing and refocusing on tasks, changing from one activity to another, sustaining attention during play and sports activity, carrying out multi-step instructions, and waiting to take turns. Plaintiff was removed from his self-contained classroom on October 11, 2005 for disruptive conduct and speech, and was suspended again for five days in November for disruptive conduct and speech.

The ALJ's conclusion that plaintiff's behaviors were volitional and not uncontrollable is not supported by substantial evidence on the record as a whole. Nor is there any support in the record for the ALJ's conclusion that plaintiff began acting up at school before his disability hearing to bolster his application for benefits.[3] Credibility determinations, when adequately explained and supported,

---

[3]The ALJ commented that "a cynic could be forgiven for noticing that the claimant's school behaviors worthy of disciplinary citation increased in head-of-steam frequency and intensity in the weeks leading up to his next disability hearing."

are for the ALJ to make. <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000). Here,

I cannot defer to the ALJ's judgment because it is not adequately explained or

supported by the record. <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir 2001). The

ALJ offers no explanation for his conclusion that plaintiff, an eleven year-old child,

intentionally manipulated his behaviors to influence his application for benefits,

other than the fact that plaintiff's suspension occurred the month before the

hearing. Yet the ALJ does not mention the date the disability hearing was set, nor

does the record contain any evidence about when plaintiff and his mother were

notified of the hearing. The transcript of the second hearing does not support the

ALJ's conclusion, either, because at the beginning of the hearing counsel noted that

it had been delayed because circumstances made it difficult to maintain contact

with his clients.[4] When the record is viewed as a whole, substantial evidence does

not support the ALJ's credibility determination regarding the volitional nature of

plaintiff's behavior.

The ALJ also found that any frequent, severe behaviors caused by plaintiff's

mental impairments could be controlled by medication. The ALJ pointed to

evidence that plaintiff at times forgot to take his medication, stating that a claimant

---

[4]Plaintiff's phone number and address changed and his mother had health issues. For these reasons, the evidence provided to the ALJ at the hearing was received by plaintiff's counsel from his clients that morning. (Tr. at 2).

may be found not disabled if he fails, without good cause, to follow prescribed medical treatment that may restore normal functioning. The ALJ then concluded that plaintiff had "no good excuse" for noncompliance when it occurred. Although the ALJ correctly cited the law, he erred when applying it here.

The record as a whole does not reflect that plaintiff was even refusing to follow his prescribed course of treatment. Plaintiff was not on medication for a brief period because Dr. Shanker retired, but his mother then took plaintiff to his pediatrician, Dr. Tillman, who began prescribing his medication. In April of 2005, plaintiff's mother also requested that the school nurse begin administering his medication because plaintiff – a ten-year old boy with ADHD – sometimes forgot to take it on his own. Plaintiff's mother had to leave for work before plaintiff went to school and ate breakfast, so she could not give him the medication herself. In addition, plaintiff's significant behavioral problems, including his problems documented by his teacher Anne Schwarte and Dr. Tillman, continued despite plaintiff regularly taking his medication as prescribed by his physician and administered by the school nurse. Under these circumstances, the ALJ erred in concluding that plaintiff was not disabled because he was failing, without cause, to follow a course of treatment that could control his impairments.

The ALJ also erred by ignoring the medical evidence of record in his

determination of plaintiff's functional limitations.  In his decision, the ALJ states that he "is not basing his decision on the medical expert's testimony."  Instead the ALJ applied his own "common-sense" test for determining childhood disability by asking whether a child's "objectionable behaviors" are "really that bad or that frequent" and the result of uncontrollable disease pathology or "willful volition." The ALJ disregarded the medical opinions of plaintiff's treating physicians, both of whom found that plaintiff suffered marked impairments in acquiring and using information, caring for himself, interacting and relating to others, and attending to and completing tasks.  The ALJ is required to evaluate all the evidence of record, including the opinions of plaintiff's treating physicians,  in his determination of disability.  Because he did not, the ALJ's opinion does not rest on substantial evidence.

The court may affirm, modify, or reverse the Commissioner's decision with or without remand to the Commissioner for a rehearing.  42 U.S.C. § 405(g). "Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of our abundant deference to the ALJ, remand the case for further administrative proceedings."  Buckner v. Apfel, 213 F.3d 1006, 1011 (8th Cir. 2000) (internal citations and quotation marks omitted).  For this reason, the Court should enter an immediate finding of disability

only if the record "overwhelmingly supports" such a finding.  See Thompson v.

Sullivan, 957 F.2d 611, 614 (8th Cir. 1992).

The record here overwhelmingly supports a finding that plaintiff is disabled.

When viewed as whole, the evidence overwhelmingly supports a finding of marked

limitations in plaintiff's ability to acquire and use information, care for himself,

interact and relate to others, and attend to and complete tasks.  Plaintiff's original

treating physician offered this opinion at the first hearing, which was supported by

the other evidence in the record, except for the non-examining consultative

examiner's opinion.  The ALJ's failure to accord proper weight to the treating

physician's opinion resulted in a remand by Judge Webber.  At the second hearing,

plaintiff's second treating physician offered a similar opinion, which was again

supported extensively by the school records and other evidence that I have already

discussed.  Once again, the medical opinion of plaintiff's treating physician was

contradicted only by a consultative examiner who did not examine or treat the

plaintiff.  The ALJ erred again by according little weight to the treating physicians'

opinions -- which conclusively establish that plaintiff has marked limitations in at

least three areas --  and relying instead on the conclusions of non-examining

consultative examiners and his own interpretation of the medical evidence.  Every

treating physician who examined plaintiff found that he has marked limitations in

acquiring and using information, caring for himself, interacting and relating to others, and attending to and completing tasks. The other evidence firmly supports their conclusions. For these reasons, I find plaintiff to be disabled.[5]

As the record overwhelmingly supports a finding of disabled, and a third hearing before the Commissioner would unnecessarily delay the receipt of benefits to which plaintiff is entitled, I find that the ALJ's decision should be reversed and this matter remanded to the Commissioner for calculation and award of benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is reversed and plaintiff is entitled to benefits. This matter is remanded to the Commissioner for calculation and award of benefits.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 29th day of August, 2008.

_____

[5]Because plaintiff has marked limitations in at least two of the domains, his limitations are functionally equivalent to a listing.